UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GERONIA FORD<br>aka "Boo Man" | No. 16 CR 463-13<br><br>Judge Virginia M. Kendall |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The UNITED STATES OF AMERICA, by JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, hereby submits this sentencing memorandum for defendant Geronia Ford aka "Boo Man." The government recommends that the court sentence Ford—whose Guidelines range is 324 to 405 months—to a sentence of 360 months' imprisonment. That sentence is appropriate based on the factors listed in 18 U.S.C. § 3553(a), in view of the multiple vile acts committed by Ford—namely, the first-degree murder of Sergio Hernandez, two separate attempted murders of a suspected cooperating witness (Individual A), and Ford's acts of intimidation and threats against a co-defendant and cooperator in the instant RICO case (Individual B).

1

I. **Ford Criminal Conduct**[1]

Ford has pled guilty to participating in the Latin Kings' racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One). PSR ¶5. Ford joined the Latin Kings no later than in 2012 as a soldier in the 97th Street Chapter, a position he maintained until at least 2018, when a federal grand jury indicted him in this case. PSR ¶11.

*Latin King Rules*

As a soldier, Ford knew that he was required to and agreed to abide by laws and codes of conduct set out in the Latin Kings' constitution and manifesto as well as his chapter's laws. R. 1312 ¶6; *see also* Chavez Tr. 277-278, 291-292. Ford was responsible for following the rules, laws, and directions of the chapter and regional leadership. R. 1312 ¶6; *see also* Chavez Tr. 289-290, 292-293; Salazar Tr. 1032. Ford knew that the laws of the Latin Kings required members to attend chapter meetings, and he did attend meetings of the 97th Street chapter. R. 1312 ¶6; *see also* Chavez Tr. 310-311, 468-469; Salazar Tr. 931. During the meetings, members discussed gang business, including violent conflicts with rival gang members, and whether or not other members of the Latin Kings were in bad standing with the gang. R. 1312 ¶6; *see also* Chavez Tr. 299, 312; Juarez-Boyd Tr. 2663. During some of these meetings,

---

[1] The sources of information in this section are the Presentence Report ("PSR"), the Government's Version of the Offense ("GVO"), Ford's Plea Agreement (R. 1312), and the transcript and exhibits from the March-April 2019 trial of four of Ford's co-defendants. Citations to the trial transcript are cited as "Tr." followed by the name of the testifying witness and page number of the cited testimony.

other members of the gang were "violated" (physically beaten) for not following the rules of the gang. R. 1312 ¶6; *see also* Chavez Tr. 299, 555-557.

Ford knew and agreed that individuals who did not comply with the gang's laws could be violated. R. 1312 ¶6; *see also* Chavez Tr. 226, 292-294, 299, 500, 516, 539-540, 603-606. Lesser violations would be punished by a timed beating administered by other Latin Kings. R. 1312 ¶6. More serious breaches of the laws could be punished by "S.O.S" (Smash on Sight) or "K.O.S" (Kill on Sight) orders which could only be issued by an Inca or a regional officer. R. 1312 ¶6; *see also* Chavez Tr. 297-299; 500, 516, 536-539; Salazar Tr. 963-964; Delgado Tr. 3371, 3442.

*Attacks of Rival Gang Members*

Ford and other Latin Kings also were required to attack rival gang members and to protect Latin King territory from rival gangs and, in particular, had to attack, stab, shoot or kill rival gang members, especially those who came into Latin King territory. R. 1312 ¶6; *see also* Chavez Tr. 214, 225-226, 229-230, 326-328, 403; Salazar Tr. 933. While Ford was a member of the Latin Kings, the gang's main rivals included the Latin Dragons, the Latin Counts, the Ambrose, the Spanish Vice Lords, the Spanish Gangster Disciples, the Black P Stones, and the Gangster Disciples. R. 1335 ¶6; *see also* Chavez Tr. 333. As described below, in 2012, Ford committed the first-degree murder of an individual named Sergio Hernandez, whom Ford suspected to be a member of the Ambrose gang.

3

Ford Murdered Sergio Hernandez

As set forth in Ford's plea agreement, on May 15, 2012, Ford, his co-defendant William Hayslette (who likewise has pled guilty and admitted to his role in the Hernandez murder),[2] and four other Latin Kings drove in a minivan through rival gang territory to see if they could find rival gang members to attack. As their minivan neared the corner of East 87th Street and South Houston Avenue in Chicago, an area under the control of the Ambrose Street Gang, Ford and another Latin King in the van directed the driver to stop the minivan. 1312 ¶6.

As the minivan turned the corner of East 87th Street and South Houston Avenue, Ford and others yelled "Ambrose Killer" at Sergio Hernandez and Andrew Escobar.[3] Ford and the other Latin Kings believed Hernandez and Escobar were Ambrose gang members based on the color of their clothing.[4] Ford and others yelled "Ambrose Killer" to signify that Ford was a member of a rival gang and was going to attack the suspected Ambrose members. Ford, Hayslette, and some of the other occupants jumped out of the minivan and confronted the two men. Ford and the

---

[2] Ford's plea agreement refers to Hayslette as "Individual C." But Hayslette's own plea agreement establishes his identity. *See* R. 1335 ¶6 (describing his role in the murder of Sergio Hernandez).

[3] Although Ford's plea agreement identifies Escobar as "Individual A," Escobar revealed his identity at the March-April 2019 trial of Ford's co-defendants Denava, Jimenez, Luczak, and Mendez, at which Escobar testified regarding his eye-witness account of the Hernandez murder.

[4] It is Ford's position that one of the two Ambrose members "threw down the crown," which was a gang sign meant to disrespect the Latin Kings. 1312 ¶6.

4

others displayed gang signs using their hands to show their affiliation with the Latin Kings, and then attacked Hernandez and Escobar on the sidewalk. 1312 ¶6.

Ford hit and battered Hernandez, and Hayslette used a metal crate to beat him.[5] Ford then pulled out a knife and stabbed Hernandez multiple times. Hernandez later died as a result of his stab wounds. After Hernandez's death, Ford and Hayslette received approval from Latin King leadership to obtain—and they did obtain—"teardrop" tattoos on their faces to signify that they killed someone on behalf of the Latin Kings. R. 1312 ¶6.



---

[5] It is Ford's position that during the fight, Hernandez swung a chain at him, striking Ford in the face. 1312 ¶6. As described below, Andrew Escobar, who was with Hernandez at the time of the murder, observed Hernandez trying to fend off the Latin Kings by swinging a cord of some kind as they attacked him.

5

Ford acknowledges that he performed the acts that caused the death of Hernandez, that he acted with the intent to kill and knew his acts created a strong probability of death, and that the murder was committed to further the Latin Kings and in the course of another felony, namely mob action, which is an inherently violent crime. R. 1312 ¶6.

In addition to the admissions contained in Ford's plea agreement, detailed above, at the March-April 2019 trial of four of Ford's co-defendants, two eye-witnesses to the murder, as well as a Chicago Police Department officer who responded to the murder scene, gave sworn testimony. Andrew Escobar, a friend of Sergio Hernandez, testified that on the morning of the Hernandez murder, he and Hernandez were walking on a sidewalk toward Escobar's grandparents' house in the area of 87th St. and Houston Ave. in Chicago, which is an area controlled by the Ambrose street gang. Escobar Tr. at 2386, 2392. As they walked, a silver van drove up from behind them at an angle. The van stopped and a group of six or more men (which Ford admits included him) rushed from the van, circled Hernandez and—from Escobar's vantage point—at least one of the men started stabbing Hernandez. *Id.* at 2387, 2394. As Ford and the others attacked and killed Hernandez, another individual from Ford's group restrained Escobar, holding him at knifepoint to prevent Escobar from attempting to intervene to save his friend; the individual made it clear to Escobar that if he tried help Hernandez, Escobar too would be stabbed. *Id.* at 2389. Consequently, Escobar was forced to watch as Hernandez made a futile attempt to fend off his attackers with

6

the only thing he could find—a cord of some sort. *Id.* at 2390. Escobar heard the attackers yell "Latin King" and "Ambro Killer," which signified to Escobar that the attackers were members of the Latin Kings street gang and intended to kill Hernandez, who was a member of a rival gang called the Almighty Ambrose. *Id.* at 2390-91. When the attackers fled in the van they had arrived in, Hernandez was already "bleeding too bad" from his side and from his mouth even speak to Escobar, who frantically called his brother and 911 for help. *Id.* at 2394-96. Not long after, Hernandez died. *Id.*

Marvin Otten, a forensic investigator with the Chicago Police Department testified about the blood-stained crime scene where Hernandez was found on that date—May 15, 2012—and confirmed the coroner's assessment that Hernandez was killed by "multiple stab wounds." Otten Tr. 2400-2415.

Ricardo Herrera, the driver of the minivan in which Ford had traveled to and from the murder, also testified at trial. Herrera explained that on the date of the Hernandez murder, Herrera was a Latin King "recruit"—meaning that he was undergoing a trial period with the gang in which he was seeking to prove himself worthy of full membership. Herrera Tr. 2418-19. On the morning of the murder, Ford called Herrera and instructed him to pick up Ford and some other Latin Kings in a vehicle. Herrera complied, picking up Ford and the others in his mother's grey minivan. *Id.* at 2428. Herrera drove the Latin Kings around various parts of Chicago for approximately an hour as his passengers smoked marijuana. *Id.* at 2432. At some

7

point, they decided to drive through rival gang territory—specifically, areas of South Chicago claimed by the Ambrose and Latin Dragons—in search of rival gang members to attack; as Herrera understood it, a successful attack would boost his chances of becoming a full-fledged Latin King. *Id.* at 2434-35. As they drove through Ambrose territory, Ford, who was the minivan's front passenger, spotted two individuals he believed to be Ambrose gang members based on the color of their clothing. *Id.* at 2436. Ford and the others jumped out. Ford yelled "Ambrose Killer" to announce that he intended to kill the Ambrose members that he had identified. *Id.* at 2439. Herrera remained in the van while the others attacked Hernandez, which happened fast—the attack lasting approximately 1-2 minutes in total. *Id.* at 2441. Afterwards, as Ford sat in the minivan's front seat, wiping blood from his knife and listening to a police scanner, Ford told Herrera that it should have been him (Herrera) who "did that to the Ambro"—indicating that Herrera, the recruit, should have killed Hernandez instead of Ford doing so. *Id.* at 2444-46. Ultimately, Herrera was rewarded for his role as driver in the Hernandez murder with an induction into the Latin Kings. *Id.* at 2448.

Lastly, Fernando Chavez aka Fester—a former leader of the Latin Kings' 97th Street Chapter—testified at trial that, after the murder, Ford bragged to Chavez about killing Hernandez. According to Chavez, Ford gave Chavez a demonstration of "how [Ford] stabbed [Hernandez]"—proudly reenacting the way in which Ford "grabbed [Hernandez] by the head, pulled it down, and was stabbing him with his

8

other arm." Chavez Tr. 549-554. Though Chavez directed Ford to stop talking about the murder, out of concern that law enforcement may learn of it, Ford continued to boast about the killing. *Id.* at 555. For his failure to keep quiet, Ford was violated (disciplined) by the gang. *Id.*

In October 2015, nearly three-and-a-half years after the murder, Ford continued to brag about killing Hernandez. In text messages admitted into evidence at trial, Ford wrote to another Latin King: "U KNOW U ENVY ME U DISSING AMBROSE U NEVER KILLED GO CATCH A BODY THEN HOLLA AT ME." Tr. Ex. 3214, attached as Exhibit 1 hereto. In a related text message, Ford boasted: "I earned my tear drop." *Id.*

*Hood Days*

As a soldier in his chapter, Ford was required to participate in hood days, which involved members of the gang standing watch and providing security in the event rival gang members came through Latin King territory. R. 1312 ¶6. Ford and the other soldiers were required to shoot at rival gang members and to kill them if needed to defend the Latin Kings' territory. R. 1312 ¶6. During these hood days, the chapter Cacique or Enforcer provided Ford and the other soldiers with one or more guns to protect the block. R. 1312 ¶6. Ford knew each chapter had chapter guns available to use and knew where at least some of these guns were located at any given time. R. 1312 ¶6. Ford knew he would be violated if he did not participate in hood

9

days, failed to shoot at a rival gang member in Latin King territory, or lost one of the chapter's guns. R. 1312 ¶6.

*Intimidation of Cooperators*

Ford further knew that Latin King members were prohibited from cooperating with law enforcement and agreed to punish suspected cooperators, including through the use of violence, at the direction of the gang's leaders. Cooperation with law enforcement could be punished by an "S.O.S" or "K.O.S" order. R. 1312 ¶6; Chavez Tr. 298; Gonzalez Tr. 2997-3005; Nagel Tr. 186. In Ford's plea agreement, he admitted to committing multiple acts of witness intimidation, including attempted murders.

<u>Ford Twice Attempted To Murder Individual A</u>

As expressly set forth in Ford's plea agreement, on or about May 11, 2013, Ford and Individual A were arrested after Chicago Police Department officers stopped their vehicle. Ford possessed in the car a 9mm handgun and thirty-five baggies of cannabis, all of which were in the glove compartment. Ford also possessed on his person two plastic baggies of cocaine. Ford was charged with possession of a firearm and narcotics-related charges. R. 1312 ¶6.

On two occasions in 2014, Ford attacked Individual A because Ford believed Individual A was cooperating with law enforcement after the May 2013 arrest because Individual A was not charged with any offenses and had been released by law enforcement. First, during the summer of 2014, Ford tried to shoot and kill

10

Individual A. In the days leading up to the shooting, Ford and Individual A argued back and forth on the phone and through text messages. The day of the shooting, Ford called Individual A and told him that he was going to ride through and "light up" Individual A, meaning shoot him. While Individual A was walking near 97th Street and S. Avenue L, Ford drove by and called Individual A a "trickass bitch." Ford opened the door to his car and started shooting at Individual A, who was not hit. R. 1312 ¶6.

Later in 2014, Ford again attacked Individual A because of his belief that Individual A was a cooperator. Specifically, on or about November 2, 2014, Ford beat and then stabbed Individual A near a convenience store located at the corner of 98th Street and S. Avenue L. Individual A was taken to the hospital and sustained serious bodily injuries, including puncture wounds to his body and head. After the stabbing, Ford called fellow Latin King Individual E, and told him about the stabbing. Ford laughed and said words to the effect of, "He was lucky I didn't kill that bitch." R. 1312 ¶6.

<u>Ford Threatened and Intimidated Cooperator and Co-Defendant Individual B</u>

As detailed in Ford's plea agreement, in May 2018, Ford sent a direct message through Facebook to Individual B, a co-defendant in the current case, who he suspected of cooperating with law enforcement in this case. In the message, Ford wrote, "You a whole rat dawg dont ever throw up no crowns dawg i actually looked up too you you sorry ass hell king u a real live bitch str8 rat ass nigga i bet u thought

11

we wasnt gunna find out you a rat dawg yo name is dead to niggas frfr dawn n just know ina feds it aint no pc we gone see you again," and continued "Bitch ass nigga." In Ford's message, he warned Individual B that he knew Individual B was a "rat dawg" (cooperating witness) and that Individual B should not "throw up no crowns" (claim to be a Latin King). In the message, Ford also told Individual B that Individual B was a "real live bitch str8 [straight] ass nigga," which was meant to convey that Ford and the other Latin King members were angry because they believed that Individual B was a cooperating witness. Ford also said, "I bet u thought we wasn't gunna find out you a rat dawg," meaning that defendant and the other members of the Latin Kings believed they had discovered Individual B's supposed cooperation even though Individual B would have wanted his cooperation kept a secret. In the message, Ford conveyed to Individual B that Ford and the other Latin Kings would seek to harm Individual B: "Just know ina feds [in the Federal Bureau of Prisons] it aint no pc [there is no protective custody]," and continued "We gone see you again." Ford followed those words with the emoji "100," to convey that he was 100% serious in making these threats of retaliation. 1312 ¶6.

*Residential burglaries and robberies*

Ford admitted in his plea agreement that while he was a member of the Latin Kings, he committed residential burglaries with other members of the Latin Kings. Defendant and others went around neighborhoods and rang the doorbell of houses. If no one was home, Ford and others went to the back of the house and broke in

12

through the back door. Ford sold the stolen goods from these burglaries on the street or on Facebook. R. 1312 ¶6.

### *Distribution of Narcotics*

Ford knew that the Latin Kings were involved in drug trafficking and agreed to participate in these activities. R. 1312 ¶6; *see also* Chavez Tr. 315-320; Salazar Tr. 927-928. Specifically, Ford knew that only Latin Kings were allowed to sell narcotics in territories controlled by Latin Kings. R. 1312 ¶6. If a non-Latin King wanted to sell narcotics in an area controlled by the Latin Kings, they had to pay the Latin King's dues on a regular basis. R. 1312 ¶6; *see also* Chavez Tr. 315-320; Salazar Tr. 927-928. Ford knew that the Latin Kings' laws prohibited the sale of heroin by Latin Kings, but that Latin Kings were selling other narcotics, including, marijuana, cocaine, and crack cocaine. R. 1312 ¶6; *see also* Chavez Tr. 315-320.

## II.     Sentencing Guidelines Calculations

The government agrees with the PSR's calculation of Ford's guidelines range. Because Ford participated in a conspiracy to commit murder, Guideline §2A1.5(c)(1) governs. *See United States v. Porraz*, (conspiracy to commit murder guideline applies to RICO conspiracy defendant when the murder of rival gang members was contemplated by gang rules). That Guideline dictates that when a defendant's participation in a conspiracy to murder resulted in a death, as it did here, §2A1.1 applies and thus Ford's base offense level is 43.

13

That guideline and a resulting base offense level of 43 apply for two additional, independent reasons. First, as specified in the parties' plea agreement, Guideline § 2A1.1 applies because the object of Ford's offense would have constituted felony murder, as Ford killed Hernandez while committing the felony offense of mob action. 720 ILCS 5/25-1 ("A person commits mob action when he or she engages in … the knowing and reckless use of force or violence disturbing the public peace by 2 or more persons acting together without authority of law."); *People v. Davison*, 236 Ill.2d 232, 244 (2010) (murder committed during the course of mob action is first-degree felony murder). *See* R. 1312 ¶9(b)(ii). Additionally, Ford's murder of Sergio Hernandez meets the federal definition of first-degree murder, as set forth in 18 U.S.C. § 1111, which presents a third basis for the application of Guideline § 2A1.1 and base offense level 43. *See, e.g., See United States v. Bell*, 819 F.3d 310 (7th Cir. 2016) (affirming that a defendant, a federal inmate, committed premeditated, first-degree murder when he walked to the cell of his victim in a "seemingly calm, deliberate, and efficient manner" and "acted in concert" with another inmate, which showed that defendant "had an appreciable period of time during which [he] considered and settled on what he was about to do" and therefore premeditated before killing his victim).[6]

---

[6] In the event that Ford contests this guideline calculation, as he did in his Motion to Withdraw His Plea Agreement (R. 2274), the government incorporates by reference pages 8-16 of its response in opposition to that Motion, which further articulates the reasons that Guideline § 2A1.1 and base offense level 43 applies. R. 2289. For ease of reference, that brief is attached as Exhibit 2 hereto.

14

The government and Probation agree that Ford also committed two predicate acts of Attempted Murder – for attempting to murder Individual A in Summer 2014 and then again in November 2014. Pursuant to Guideline § 2A2.1(a)(2), the base offense level for each attempted murder is 33. Pursuant to Guideline § 2A2.1(b)(1)(B), the offense level for the November 2014 attempted murder is increased by 2 levels (to offense level 35) because the victim sustained serious bodily injury.

The government and Probation agree that Ford also committed the predicate act of Witness Intimidation (for intimidating cooperator Individual B) and, pursuant to Guideline § 2X3.1(a)(1), that the offense level for such act is 30.

Finally, the government and Probation agree that, pursuant to the grouping rules set forth in § 3D1.4, there are 1.5 units—1 unit for the murder of Sergio Hernandez and 0.5 units for the November 2014 attempted murder of Individual A—which results in a Combined Adjusted Offense Level of 44. Because Ford has fully accepted responsibility for his conduct, his offense level is reduced to 41.

With a total adjusted offense level of 41 and a criminal history category of I, Ford's guidelines range is 324 to 405 months' imprisonment. Notably, the parties agreed in the plea agreement that, pursuant to Rule 11(c)(1)(C), Ford's sentence shall be between 25 years and 40 years in prison, subject to acceptance by the court. R. 1312 ¶ 11.

### III. The Section 3553(a) Factors Support a Guidelines Sentence.

Considering the factors set forth in 18 U.S.C. § 3553(a), the government

15

recommends a sentence of 360 months' imprisonment. Such a sentence is sufficient, but not greater than necessary to reflect the seriousness of Ford's offenses, promote respect for the law, provide just punishment, and afford adequate deterrence. A sentence near the mid-point of Ford's guidelines range is fair and reasonable in light of the heinous murder committed by Ford, his multiple attempted murders, and his intimidation of a cooperating witness in this case.

### A. The Nature and Circumstances of the Offense, and the History and Characteristics of the Defendant

The Latin Kings' impact in Chicago cannot be overstated. For generations, the gang has terrorized communities around the city, including the area at issue in this case—the southeast side of Chicago. Acting according to a manifesto and constitution, Latin Kings like Ford have devastated neighborhoods with violence, drug dealing, and witness intimidation. Ford actively participated in this conspiracy.

Ford's plea agreement notes that he joined the Latin Kings no later than in 2012—by age 18. Ford told Probation that he first became involved with the gang at the age of 12 (in approximately 2006) out of pressure and fear. PSR ¶103. Even crediting that initial motivation, there is no question that, once he joined the Latin Kings in earnest, Ford participated willingly, enthusiastically, and brazenly. Ford served for years as a violent soldier in the gang's 97th Street Chapter. He admits he attended gang meetings to stay abreast of which gangs the Latin Kings were at war with and participated in "hood days" to ensure that any rival gang members who entered their territory were attacked. Ford admits he agreed "to attack, stab, shoot

16

or kill rival gang members." And he did just that.

As set forth above, on May 2012, in broad daylight, Ford and others drove through rival gang territories specifically looking for someone to attack. They enlisted a young recruit, a high school student, to drive them in his mother's minivan as they searched for a victim. When they spotted Sergio Hernandez, Ford announced his intent—yelling "Ambrose Killer"—and executed a swift and calculated kill in an estimated 1-2 minutes' time. Ford stabbed Hernandez repeatedly, while other Latin Kings restrained Hernandez's friend at knifepoint to ensure Hernandez's death. When the attack was over, Hernandez was left too bloodied even to speak.

The Hernandez murder epitomizes the brand of terror that Ford and his co-conspirators inflicted on Chicago and elsewhere—murdering a stranger at 10:30 in the morning because of the color of his clothing, a victim they had hunted for that day. Highlighting the depravity of it all, Ford branded his <u>face</u> with a teardrop tattoo to commemorate the event. That is the opposite of remorse. Years later in 2015, he continued to brag about the murder, boasting that he'd earned his teardrop tattoo and mocking another Latin King for merely "dissing an Ambrose," while Ford had "killed" one. "Go catch a body, then holla at me," Ford taunted.

The Hernandez murder was not some one-time lapse in judgement, where Ford got swept up in the moment. Rather, as described above, more than two years later, Ford tried to murder another person—Individual A—on <u>two</u> separate occasions. Suspecting that Individual A was cooperating with law enforcement, Ford opened fire

17

on him in public in the summer of 2014. When his bullets missed his intended victim, Ford attacked him again that fall—this time successfully stabbing him in the head and body in November 2014. Remorseless again, Ford laughed about the attack, telling a fellow gang member afterwards: "He was lucky I didn't kill that bitch."

Even after he was indicted in this case in February 2018, Ford sought to intimidate a cooperating witness through threats of violence. In May 2018, as quoted above and as set forth in his plea agreement, Ford sent direct messages through Facebook to a cooperator in which Ford threatened to attack the cooperator in the Bureau of Prisons, where Ford believed there "ain't no pc [protective custody]" that would keep the cooperator safe from him. Ford made sure to convey that he was "100% serious in making these threats of retaliation." From Ford's previous attempts at killing Individual A for cooperating with law enforcement, we know that this was not merely tough talk.

This Court's sentence should reflect the revolting nature of Sergio Hernandez's murder, Ford's multiple attempts to take the life of a suspected government cooperator, and his threats to attack a cooperating witness in this RICO case, in addition to the untold damage and destruction caused to the Chicago community by Ford's years of dutiful participation in the Latin Kings street gang and conspiracy.

### B. The Need to Provide Just Punishment and Deterrence and to Protect the Public from Further Crimes of the Defendant

For years, Ford acted without regard for the law or the dignity of human life. Though Ford was raised by caring and supportive parents, excelled in school, and

18

found a devoted partner (PSR ¶¶99-109), there can be no question that, but for a federal indictment, Ford would have continued wreaking havoc on the city of Chicago as an active member of the Latin Kings. A significant sentence, therefore, is necessary to protect the public from Ford. It likewise is necessary to promote respect for the law, deter his own future criminal conduct, and send a clear and forceful message of deterrence to other current or potential Latin King soldiers that those who commit murder and other gang violence or seek to intimidate government cooperators are punished harshly under federal law. Although Probation has recommended a below-guideline sentence of 300 months, it is the government's strong view that the repeated, vicious nature of Ford's conduct compels a harsher punishment. It is the government's position that a sentence of 360 month's imprisonment—near the mid-point of Ford's advisory range—is sufficient, but not greater than necessary, to achieve the statutory goals of §3553(a).

### IV. The Length and Conditions of Supervised Release

The government respectfully submits that the relevant § 3553(a) factors addressed above justify the imposition of a three-year term of supervised release, pursuant to the conditions proposed by the Probation Office. The conditions recommended by the probation officer will provide needed deterrence to criminal conduct, protect the public from further crimes of the defendant, provide needed drug treatment, and keep the probation officer informed of the defendant's conduct, condition, and compliance.

19

## V. Conclusion

For the reasons stated, the government respectfully requests that the court impose a sentence of 360 months' imprisonment, a three-year term of supervised release, and a $100 special assessment.

Respectfully submitted,
JOHN R. LAUSCH, JR.,
United States Attorney

By: /s/ Brian Kerwin
ASHLEY CHUNG
JOHN COOKE
BRIAN KERWIN
GRAYSON WALKER
Assistant United States Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300
