# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GERONIA FORD | Case No.: 16-cr-463-13<br>Hon. Virginia M. Kendall<br><br>**DEFENDANT GERONIA FORD'S SENTENCING MEMORANDUM** |

## INTRODUCTION

Geronia Ford respectfully submits this memorandum in advance of his sentencing scheduled for July 19, 2021. As the Court is aware, Mr. Ford pled guilty to Count 1 of the indictment, which charged him with racketeering in violation of 18 U.S.C. § 1962(d). *See* Dkt. 593, p. 25 (indictment); Dkt. 1312 (Plea Agreement). The "most serious underlying conduct" relevant here—which should drive Mr. Ford's sentence for racketeering under the guidelines, *see United States v. Garcia*, 754 F.3d 460, 483 (7th Cir. 2014)—was stabbing and killing a rival gang member, Sergio Hernandez, on May 15, 2012.

What Mr. Ford did was inexcusable, and he faces a substantial period of incarceration. But Mr. Ford was 17 years old at the time of Mr. Hernandez's death, for which he takes full responsibility. And he had never served any time prior to his arrest in this case. As described in detail below, even the high end of a properly-calculated sentencing guideline range *would still be less* than the 25-40 year imprisonment range provided in the Plea Agreement. Further, when compared to more senior co-defendants who were leaders in the Latin Kings enterprise, did not fully accept responsibility, and have already been sentenced, a 25-year term appears excessive. A sentence below the low end of the range provided in the Plea Agreement would still be "sufficient, but not greater than necessary" to meet the sentencing factors articulated in 18 U.S.C. § 3553.

Mr. Ford looks forward to discussing these matters with the Court at sentencing.

# BACKGROUND

**I.  PERSONAL BACKGROUND**

Geronia Ford was born in Chicago, Illinois on November 18, 1994.  (*See* PSR ¶¶ 3, 99.)  He was 17 at the time he committed the crime against Mr. Hernandez, and he will be 26 years old when is sentenced on July 19, 2021.

As described in the letters of support attached as Exhibit A, Mr. Ford is a devoted father of two young daughters, a beloved son and an uncle.  He has two parents that love him and believe in him; they are heartbroken by his conduct.  (PSR ¶¶ 104-05.)  But Mr. Ford grew up in a neighborhood riddled with gang activity, *see* PSR ¶ 103, and gang activity defined his life until his arrest.

Mr. Ford was pressured into joining the Latin Kings at age 12.  He joined the gang out of fear.  (*See* PSR ¶ 103.)  His only prior conviction (before his arrest in this case) was a juvenile arrest in 2009, when Mr. Ford was 14 years old.  (*Id.* ¶ 83).  Mr. Ford was sentenced to probation for possession of a firearm, and in the arrest report, Mr. Ford noted that he was already a member of the Latin Kings.  (*Id.*)  According to his mother, his parents relocated more than once in an effort to keep him away from the gang.  Unfortunately, escape proved impossible for Mr. Ford; other gang members "continually threatened him until he was forced to join the Latin Kings."  (*Id.* ¶ 105).

Gang life also introduced Mr. Ford to illicit substances.  Mr. Ford began using marijuana at the age of 12, cocaine and Xanax by the age of 14, and codeine by the age of 17.  (PSR ¶¶ 120-22.)  Mr. Ford also tested positive for both cocaine and marijuana while out on bond in this case. *Id.* ¶ 125. Mr. Ford recognizes his addiction and wants to participate in a drug treatment program while serving his sentence.  (*Id.* ¶ 124).  It is important to note again that prior to his arrest in this case, he had only one conviction, and it was a juvenile offense for which he received probation (which he completed successfully).  (*See id.* ¶¶ 81-84.)

## II. THE OFFENSE CONDUCT

Mr. Ford was a "soldier" in the 97th Street Chapter of the Latin Kings. (PSR ¶ 12.) As the Court is aware from proceedings involving Mr. Ford's co-defendants, as a soldier, Mr. Ford was accountable to chapter leadership and was required to follow their rules and directions. (*Id.* ¶ 11.) Violation of gang rules could be punished by beatings, or "SOS" (smash on sight) or "KOS" (kill on sight) orders. (*Id.* ¶ 13.) In fact, after Mr. Hernandez's death in 2012 and before Mr. Ford's arrest, his daughter was born and Mr. Ford attempted to disassociate himself from the gang. As a result, leadership issued an "SOS" order against Mr. Ford, *Id.* ¶ 32, and he was threatened by other members, *see* CPDR_010-000086-90.

Mr. Ford's duties as a soldier in the Latin Kings included participating in "hood days" where groups of members would attack rival gangs when they came into Latin King territory, and otherwise attacking rival gang members. (PSR ¶¶ 13-14). Mr. Ford knew that, due to the gang's rules, "he would be violated if he did not participate in hood days, failed to shoot at a rival gang member in Latin King territory, or if he lost one of the chapter's guns." (*Id.* ¶ 15.)

On May 15, 2012, Mr. Ford and several other Latin Kings entered an area known to be controlled by the Almighty Ambrose gang. (*Id.* ¶ 17; *see also* Dkt. 1312, Plea Agreement, p. 8-9.) Two men believed to be Ambrose members "threw down the crown," a gang sign "meant to disrespect the Latin Kings." *See* Dkt. 1312, Plea Agreement p. 8. Mr. Ford and others stopped, "displayed gang signs using their hands to show their affiliation with the Latin Kings, and then attacked Hernandez and [another individual] on the sidewalk, including [Mr. Ford] hitting and battering Hernandez." *Id.* at 8-9. During the fight, Mr. Hernandez "swung a chain" at Mr. Ford, and Mr. Ford pulled out a knife, stabbing Mr. Hernandez multiple times and leading to his death. *Id.*[1]

---

[1] The PSR refers to the device Mr. Hernandez used during the fight as a "type of cord with which he allegedly struck Defendant Ford." *See* PSR ¶ 18. Mr. Ford does not know what the reference to a "cord" is and defense counsel do not either. Regardless, Mr. Ford does not dispute that he and others jumped out of the car and attacked Mr. Hernandez on the sidewalk on May 15, 2012, and that the fight ultimately resulted in his stabbing Mr. Hernandez to death.

3

Mr. Ford is extremely remorseful for the senseless violence that led to Mr. Hernandez's death. In March, he wrote a letter to Mr. Hernandez's family, accepting responsibility for the pain he caused them. (*See* Exhibit B, Ford Letter to Hernandez Family.) In that letter, Mr. Ford was clear: "there's honestly no way I can justify my actions," which illustrate the senselessness of gang violence: "nothing good comes out of gang life." (*Id.*) Similarly, in his interview with pre-trial services, Mr. Ford "expressed remorse for his past conduct and reported that he takes full accountability for the past choices he has made." (PSR ¶ 39; *see also id.* ¶¶ 76-77 (acceptance of responsibility).)

### III. THE PLEA AGREEMENT

On November 16, 2018, Mr. Ford entered into a Plea Agreement "governed in part by Rule 11(c)(1)(A) and Rule 11(c)(1)(C)." *See* Dkt. 1312. Mr. Ford pled guilty to Count 1 of the Indictment, *see id.* ¶ 5, and admitted a series of facts, including "participat[ing] in the conduct of the affairs of the Almighty Latin Kings Nation street gang through a pattern of racketeering activity described in Count One of the indictment," *see id.* ¶ 6(a). He admitted his role in the murder of Sergio Hernandez, *see id.* p. 8-9, participating in residential burglaries with other Latin King members, *id.* at p. 10, and intimidating those suspected of cooperating with law enforcement, *id.* p. 10-12.

The Plea Agreement contains a guideline calculation. *Id.* ¶ 9. The key input into that calculation is the classification of the base offense. The Agreement provides that "[p]ursuant to Guideline § 2A1.1, the base offense level is 43 because the object of the offense would have constituted felony murder, specifically, mob action." *Id.* ¶ 9(b)(ii)(1). Driven by that assumption, the anticipated offense level was 41 and the advisory sentencing range was 324-405 months' imprisonment. *Id.* ¶ 9(d). The parties agreed, however, that any errors "in applying or interpreting any of the sentencing guidelines may be corrected by either party prior to sentencing." *Id.* ¶ 10. And, as the Court previously confirmed, it "is unconstrained by the preliminary calculations contained within the Agreement as, ultimately, the Agreement explicitly leaves all sentencing guidelines calculations to the Court." Dkt. 2318 at 5-6.

4

The Plea Agreement is governed in part by Federal Rule 11(c)(1)(C). The parties "agreed that the sentence imposed by the Court shall include a term of imprisonment in the custody of the Bureau of Prisons of not less than 25 years and not more than 40 years." Dkt. 1312, Plea Agreement ¶ 11. Mr. Ford previously moved to withdraw from the Agreement because errors in the document affected his decision to sign it; he would not otherwise have agreed to the 25-40 year range. *See* Dkt. 2274 (Motion to Withdraw), 2298 (Reply). In denying Mr. Ford's motion, the Court described the consequences of this provision: if the Court imposes a sentence lower or higher than the range in the Plea Agreement, "either Ford or the government may withdraw." Dkt. 2318 (Order Denying Mtn. to Withdraw) at 6-7. Thus, imposing a sentence below or above the agreed imprisonment term would not necessarily void the Plea Agreement, but would give the parties the option of accepting the Court's decision or starting anew.

## IV. MR. FORD'S CONDUCT SINCE BEGINNING TO SERVE HIS SENTENCE

Mr. Ford has now served more than two years of his sentence at the MCC. Like others at the MCC, Mr. Ford has been on lockdown for much of that time due to COVID-19. He was only permitted to leave his cell for 30 minutes per day. (PSR ¶ 117.) Mr. Ford also knows that, regardless of the precise sentence ordered by the Court, he deserves to serve, and will serve, substantial time.

That said, Mr. Ford is trying to serve his debt to society productively. While at the MCC last year, he studied for and received his GED. (*See* Exhibit C, GED Certificate.) Mr. Ford also completed a parenting class (*see* Exhibit D, Certificate) and a pre-Math course (*see* Exhibit E) prior to the pause in programming caused by COVID-19. Mr. Ford intends to continue taking advantage of the programming offered by whatever facility he is placed in, so that he is in as good a position as he can be upon release.

During his two years at the MCC, Mr. Ford has kept in close touch with his family, particularly his kids, Cassidy and Lilly. (PSR ¶¶ 101, 107, 117.) Mr. Ford's only incident over the last two years was using another inmate's account to spend extra time on the phone with his kids (*Id.* ¶ 7.) He hopes to maintain a close relationship with his kids and their mother despite a long prison term. (*Id.* ¶ 108.)

## MR. FORD'S POSITION ON SENTENCING

**I. IMPRISONMENT**

"[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall v. United States*, 552 U.S. 38, 49-50 (2007). These factors include "the nature and circumstances of the offense," "the history and characteristics of the defendant," and "the need for the sentence imposed" to reflect the statutory purposes of punishment: incapacitation, just punishment, deterrence, and rehabilitation. 18 U.S.C. § 3553(a)-(b). While the Court must perform a guideline calculation, it need not find "extraordinary circumstances" to justify a sentence outside the guidelines range. *Gall*, 552 U.S. at 47. And the Court should not presume that a sentence within the advisory guidelines range is reasonable. *Nelson v. United States*, 555 U.S. 350, 352 (2009).

### A. A Correct Guideline Calculation Would Produce A Range Of 235-293 Months

#### 1. The Correct Base Offense Level Is 38

Sentencing begins with a guideline calculation, and the correct guideline calculation here would produce a range of 235-293 months. Both the Plea Agreement, *see* Dkt. 1312 (Plea Agreement) ¶ 9, and the PSR, *see* PSR ¶¶ 43-78, inaccurately calculate Mr. Ford's offense level and guideline range.[2]

Given that Mr. Ford pled guilty to racketeering, the guideline calculation starts with U.S.S.G. § 2E1.1. That section provides that the base offense level should be 19 or, if higher, "the offense level applicable to the underlying racketeering activity." *See* U.S.S.G. § 2E1.1(a). Thus, the key question is what offense level is "applicable to the underlying racketeering activity," and the Seventh Circuit has previously stated (in a case involving another Latin King RICO conspiracy) that district courts should look to the "most serious underlying conduct." *Garcia*, 754 F.3d at 483-84.

---

[2] The PSR and Plea correctly place Mr. Ford in Criminal History Category I.

6

The "most serious underlying conduct" here is the murder of Mr. Hernandez on May 15, 2012. It is the crime discussed in detail in the PSR (*see* PSR ¶¶ 16-21) and Plea Agreement (Dkt. 1312, 8-10). It is the crime identified as the key predicate act in the Plea Agreement (*id.* ¶ 9(b)(ii) ("Murder of Sergio Hernandez. Pursuant to Guideline 2A1.1, the base offense level is 43 because the object of the offense would have constituted felony murder, specifically, mob action.") and PSR (*see* PSR ¶ 45 ("In this matter, §2A1.1 is applicable as the defendant committed felony murder while engaging in mob action.")). In fact, the parties agreed in the Plea Agreement that the relevant "underlying racketeering activity" is murder, not conspiracy to commit murder. *See* Plea Agreement ¶ 9(b)(v)(3) ("Pursuant to the Guideline for RICO conspiracy, specifically Guideline § 2E1.1(a)(2) and Note 1, the offense level for the underlying racketeering activity, namely murder, applies."), *see also id* ¶ 9(b)(vi)(2) (similar).

Thus, under the terms of the Plea Agreement, the only relevant question should be *which* murder guideline applies, and a plain reading of the guidelines and federal murder statute leads to a clear answer: the second degree murder guideline of § 2A1.2. That provision applies because Mr. Hernandez's death was not premeditated and the identified felony ("mob action") is not listed in the federal murder statute, 18 U.S.C. § 1111. The lack of premeditation appears undisputed. The Superseding Indictment to which Mr. Ford pled guilty identifies six different murders committed "in the conduct of the affairs of the enterprise" (the Latin Kings). *See* Dkt. 593 ¶ 9(w)(i)-(vi). But the grand jury only found five of those six murders to have been premeditated—and deliberately excluded the Hernandez murder from that list. *Id.* ¶ 11. Further, in prior briefing before this Court, the government conceded that the Hernandez murder was not premeditated. *See* ECF No. 1601, at 12 (the government argues that "pursuant to the existing plea agreement, the parties *agree* that Ford's actions do not constitute premeditated first-degree murder. Indeed, neither the Superseding Indictment nor the plea agreement describes the Hernandez murder as one committed in the first degree.") (emphasis in original).

While both the Plea Agreement and PSR contend that the Hernandez murder qualifies as First Degree Murder under § 2A1.1 because it is a felony murder (the felony being state-law "mob action"),[3] that is legal error. State-law "mob action" does not qualify a murder as a first degree murder under federal law. The federal murder statute, 18 U.S.C. § 1111(a), states:

> Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

Any other murder is murder in the second degree.

It is undisputed that the Hernandez murder was not premediated, and similarly undisputed that "mob action" is not one of the enumerated felonies creating "felony murder" under 18 U.S.C. § 1111(a). And because Section 1111 provides a specific list of enumerated felonies that make a "felony murder" a first degree murder under federal law, that list is *exclusive* for liability and for sentencing purposes. Because "mob action" is *not* one of the felonies listed, it cannot be used to justify a first-degree sentence against Ford, either under the federal murder statute or the sentencing guidelines.

The Tenth Circuit considered an analogous issue in *United States v. Fortier*, 180 F.3d 1217, 1226 (10th Cir. 1999). The defendant in *Fortier* received stolen firearms, sold them, and gave the proceeds to Timothy McVeigh to finance the bombing of the Murrah Federal Building in Oklahoma City. *Id.* The

---

[3] The government previously asserted that the "mob action" theory was the basis on which it asserts that Section 2A1.1 applies. *See* ECF No. 1601, at 2 ("In light of these factual admissions, the parties agreed that, pursuant to Guideline §2A1.1, Ford's murder of Sergio Hernandez is governed by a base offense level of 43, because Ford's actions constituted felony murder - specifically, mob action."), *id.* at 12-13 (the government representing that "Guideline § 2A1.1 applies because Ford committed *felony* murder - the felony being mob action, under Illinois law. **It is on that basis alone** that Sentencing Guideline §2A1.1 (and a base offense level of 43) applies.") (italics in original, bold added).

8

defendant pled guilty to several charges, including conspiracy to transport stolen firearms. *Id.* at 1222. At sentencing, the district court applied a series of cross-references to the murder section of the sentencing guidelines. *Id.* When choosing between *which* of the federal murder sentencing options best applied to the case, the district court picked first-degree murder because that was what the court believed was most consistent with the defendant's intent:

> Chapter 2A1 governs homicide offenses and provides us with the following options: 2A1.1, first-degree murder; 2A1.2, second-degree murder; 2A1.3, voluntary manslaughter; 2A1.4, involuntary manslaughter; and 2A1.5, conspiracy to commit murder. Mr. Fortier argues for section 2A1.4, while the government sides with the district court's application of section 2A1.1. The [district] court selected the more serious guideline because it opined "the plain meaning of § 2K2.1(c)(1) suggests that the court can, and should, look to the nature of the crime that a defendant facilitated by transferring defendant's own intent. Because the other crime was a bombing which resulted in 168 deaths, the [district] court felt it appropriate to attach the severe consequences of the first-degree murder guideline.

*Fortier*, 180 F.3d at 1225–26.

The Tenth Circuit vacated and remanded for resentencing. Citing previous circuit precedent, the court determined that when picking which of the various "murder" options under the guidelines applied, it could not pick "felony first degree murder" unless the murder *related to one of the specific felonies enumerated in Section 1111(a)*:

> The doctrine of felony murder expresses a highly artificial concept that generally deserves no extension.... In keeping with our desire not to unduly expand the doctrine, we hold our decision in the context of sentencing must be made with 18 U.S.C. § 1111(a) as a guide.

*Id.* at 1226. There, because the defendant's crime was not committed in the course of any of the specific felonies enumerated in Section 1111(a), the defendant could not be sentenced with reference to Section 2A1.1 of the sentencing guidelines, and instead had to be sentenced under the guidelines for non-premeditated murders. *Id.*

The Seventh Circuit essentially adopted the logic of *Fortier* in *United States v. Thomas*, 280 F.3d 1149, 1156–58 (7th Cir. 2002). The defendant in *Thomas* was convicted of bartering stolen firearms and

9

being a felon in possession. As in *Fortier*, the district court had used a cross-reference within the guidelines, finding that because death resulted from the conduct, it was appropriate to use the "most analogous offense guideline" from the homicide guidelines. *Id.* at 1155 (citing U.S.S.G. § 2K2.1). The district court in *Thomas* (as in *Fortier*) chose 2A1.1—felony first-degree murder—but the Seventh Circuit reversed. *Id.* at 1155-58. The Seventh Circuit's rationale is directly applicable here, where the government is not arguing premeditation and none of the enumerated felonies in Section 1111 exist:

> The government argues that despite the lack of findings supporting premeditation, the district court's selection of first degree murder can be sustained under the felony murder doctrine. Under that doctrine, every murder "committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnaping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, burglary or robbery ... is murder in the first degree." 18 U.S.C. § 1111(a). Thomas responds that because his offenses of conviction—unlawful possession of a firearm as a convicted felon and bartering a stolen firearm—are not among those offenses listed as predicate felonies, the felony murder doctrine cannot apply. He relies on a Tenth Circuit case which holds that in order for the felony murder to apply, the defendant's offense of conviction must serve as a predicate felony under 18 U.S.C. § 1111(a). *United States v. Fortier,* 180 F.3d 1217, 1226 (10th Cir. 1999). . . .
>
> [T]he district court did not address the question whether Thomas committed robbery or any other act that could be the basis of a felony murder finding. All the court found was that Thomas was involved in the *theft* of Leal's gun, and theft is not one of the predicate offenses listed in 18 U.S.C. § 1111(a). Just as a court needs facts to support a finding of premeditation for "regular" first degree murder, it needs facts to support a felony for first degree felony murder . . . . Therefore, the district court's selection of first degree murder under a felony murder theory cannot stand.

*Thomas*, 280 F.3d at 1157–58.

The bottom line is that because: (1) there was no premeditation, *see* Dkt. 1601 at 12-13; and (2) "mob action" is not one of the enumerated felonies in 18 U.S.C. § 1111(a), Mr. Ford's role in Mr. Hernandez's death was second degree murder and setting his base offense level with reference to U.S.S.G. § 2A1.1 would be incorrect. *See* 18 U.S.C. § 1111(a) ("Any other murder is murder in the second degree."); *compare* U.S.S.G. § 2A1.1; *with* § 2A1.2.

10

The PSR also attempts to get to the First Degree Murder guideline from another direction, arguing that "the underlying offense is conspiracy or solicitation to commit murder, U.S.S.G. § 2A1.5 . . . [and s]ince the offense resulted in the death of a victim, U.S.S.G. § 2A1.1 (First Degree Murder) is applied. U.S.S.G. § 2A1.5(c)(1)." PSR ¶ 46. Respectfully, that analysis is flawed for at least three reasons.

*First*, the statement that "the underlying offense is conspiracy to commit murder" is incorrect. The Plea Agreement explicitly lists the offenses "comprising the racketeering activity." *See* Dkt. 1312, Plea Agreement § 9(b)(i). The "underlying offenses" listed as comprising the racketeering activity are the murder of Mr. Hernandez, two subsequent attempted murders, and one instance of witness tampering. *See id.* 9(b)(ii)-(v). Mr. Ford did not plead to the underlying offense of "conspiracy to commit murder"; he pled to the underlying offenses actually listed, and it would be unfair to change the underlying offense listed in the Plea Agreement for sentencing purposes while holding Mr. Ford to the rest of the Agreement.

*Second*, the PSR's reading of the Sentencing Guidelines would collapse Sections 2E1.1 and 2A1.5 into a single guideline requiring application of the First-Degree Murder guideline in every case where a RICO conspiracy leads to the death of a victim. Every case to which Section 2E1.1 applies could, by definition, be called a "conspiracy"—racketeering requires one. Thus, under the PSR's logic, every case charged as a RICO conspiracy where someone dies would, by definition, fall within the guideline for Section 2A1.5 and, by definition (as someone has died), Section 2A1.5(c)(1) would also apply. But if the drafters of the Sentencing Guidelines intended that result, they surely would have said it in a much more straightforward way—by simply saying that if death resulted from a RICO conspiracy, Section 2A1.1 applied. They did not.

*Third*, if the PSR's application of the guidelines were correct, Section 2A1.1 would have to apply to <u>*every single defendant in this case*</u>—whether or not he personally participated in any actual murder. The offense referenced in Guideline Section 2A1.5(c)(1) is conspiracy to commit murder. If *that* is the

11

"underlying offense" applicable to Mr. Ford, it is the "underlying offense" applicable to every defendant. And as the indictment describes, there were six murders committed "in the conduct of the affairs of the enterprise," five of which (all but the Hernandez murder) were premeditated. *See* Dkt. 593 ¶¶ 9(w)(i)-(iv), 11. As the Seventh Circuit described in a prior appeal arising from this very case, when sentencing a defendant, "the overt acts personally committed by a defendant do not establish the most serious underlying racketeering activity attributable to him." *United States v. Porraz*, 943 F.3d 1099, 1103 (7th Cir. 2019). Instead, members of a conspiracy are liable for the conduct of others in furtherance of the jointly taken criminal activity and reasonably foreseeable in connection with such conspiracy. *Id*.

Thus, under the PSR's rationale, all of Mr. Ford's co-defendants—and indeed all Latin Kings—should be sentenced under the cross-reference in Section 2A1.5(c)(1) for the murder of Mr. Hernandez, or for any of the six murders carried out by Latin Kings as part of this RICO enterprise. But that is not what has happened to date in these cases. Neither defendant in *Porraz* nor *Garcia* was sentenced using the cross-reference to Section 2A1.1 in Section 2A1.5(c)(1), even though it is indisputable that "the offense" for which they were sentenced (conspiracy or solicitation to commit murder, because that's what Latin Kings are required to do), "resulted in the death of a victim."

Accordingly, the PSR's assertion that even if the "felony murder via mob action" theory in the Plea Agreement were legally flawed (which it is), the correct calculation gets to the same place through the cross reference in U.S.S.G. § 2A1.5(c)(1), is incorrect. Mr. Ford did not plead guilty to "Conspiracy or Solicitation to Commit Murder" (so that is not the right predicate offense) and the senior-level Latin King defendants who *did* plead to that very offense as part of the same alleged RICO enterprise have not been sentenced under that section, even though one or more victims' death clearly resulted from the alleged conspiracy. Thus, this theory cannot save the error in the Plea Agreement, and the correct Base Offense Level Applicable to Mr. Ford is 38, *see* U.S.S.G. § 2A1.2.

## 2. The Proper Adjustments Lead To A Guideline Range of 235-293 Months

As described above, with the Hernandez murder properly classified as second-degree murder, Mr. Ford's initial base offense level is 38 (5 levels below the 43 stated in the Plea Agreement). *See* U.S.S.G. § 2A1.2. After factoring in adjustments under U.S.S.G § 3D1.4 and U.S.S.G § 3E1.1 consistent with the Plea Agreement, however, Mr. Ford's offense level increases to 41.

This is due to adjustments described in the Plea Agreement for multiple offenses. *See* U.S.S.G. § 2E1.1, Application Note 1. Pursuant to U.S.S.G. § 3D1.2(d), the listed offenses in the Plea Agreement each count as a separate group. *See* U.S.S.G. § 3D1.4, Application Note 1. For Mr. Ford, a November 2014 attempted murder listed in the Plea Agreement has an offense level of 35, creating one unit. U.S.S.G. § 3D1.4(a). A 2014 offense listed in the Plea Agreement has an offense level of 33, creating one-half unit. U.S.S.G. § 3D1.4(b). Witness tampering has an offense level of 30, adding one-half unit. *Id*. With one unit applicable to the second degree murder charge, there are three total units, adding three offense levels to the base offense level of 38 and creating an offense level of 41. U.S.S.G. § 3D1.4.

That said, Mr. Ford also has "clearly demonstrated acceptance of responsibility for the offense," *see* PSR ¶ 76, and timely notified the authorities of his intention to enter a guilty plea, *see* PSR ¶ 77. Accordingly, Mr. Ford's offense level should be reduced by three levels, bringing him to a total offense level of 38. *See* U.S.S.G. 3E1.1(a)-(b).[4] With a total offense level of 38 and a Criminal History Category of I, Mr. Ford's properly-calculated sentencing guideline range should be 235-293 months.[5]

---

[4] Mr. Ford admits his guilt and is remorseful. While he did seek to withdraw from his plea *agreement* (which was negotiated by prior defense counsel), he never sought to take his case to trial. As such, Mr. Ford should receive the 3-point reduction for acceptance of responsibility.

[5] Mr. Ford also notes that, when he was arraigned on the superseding indictment on February 8, 2018, he was expressly told that the maximum term of imprisonment that he was facing was 20 years. *See* 2/18/18 Tr. at 33:13-34:1 ("[AUSA OWENS]: Your honor, Mr. Ford is charged in Counts One and Two of the superseding indictment. . ... Both of these carry a maximum term of imprisonment of 20 years . . . .. THE COURT: Okay. All right. Do you understand, Mr. Ford, that if you're convicted, that's the maximum amount of time and penalty you can receive? DEFENDANT FORD: Yes.")

**B. Other Mitigating Factors Suggest That Even The Low End Of The Plea Agreement's Range Would Be Excessive Punishment For Mr. Ford.**

Mr. Ford fully accepts responsibility for his horrific acts, and he understands he deserves to serve, and will serve, substantial prison time. The only question before the Court is whether, for example, he should serve a 25 year sentence, or something modestly less or more. Without minimizing his egregious conduct, there are several factors the Court should consider in mitigation.

*First*, as described above, Mr. Ford was 12 when he joined the Latin Kings and 17 years old when he killed Sergio Hernandez. "[A] district court may properly consider a defendant's age as it relates to the possibility of her committing crimes in the future." *United States v. Carter*, 538 F.3d 784, 792 (7th Cir. 2008) (citing *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming a below-guidelines sentence where the district court's reason for the variance was that the defendant would be middle-edged when he was released, making it unlikely he would be involved in another violent crime). While murder cannot be minimized as a youthful indiscretion, the reality is that Mr. Ford was a teenager when he committed the worst of his criminal acts. It is now nearly a decade later; today, Mr. Ford is 26 and a father of two, has renounced his membership in the Latin Kings, and is not the same person he was when he committed that horrible act. He will be in his 40s (at the earliest) when he is released, and will have no reason to engage in violent crime. While age certainly does not justify what Mr. Ford did, he respectfully submits that it is a mitigating factor that the Court should consider.

*Second*, this is Mr. Ford's first adult criminal conviction. *See* PSR ¶ 84. While he had some gang-related arrests when he was under 18, *see* PSR ¶¶ 88-97, he never served any time prior to his arrest in this case. *See* Sentencing Recommendation at 4 ("In mitigation, the defendant is a young man who, prior to this case, had never been imprisoned."). His first time in prison will be a lengthy one, but Mr. Ford will be rehabilitated by a far shorter sentence then others who should have learned their lessons during prior prison terms.

*Third*, a comparison to others who have either pled guilty or were convicted after a trial in this very case suggests that the sentencing range in the Plea Agreement (of 25-40 years) is longer than necessary to serve the Section 3553 factors. Mr. Ford notes the following:

- Mr. Porraz was a leader of the Latin Kings—he had risen from a soldier to an Inca over a 9 year period. *See Porraz*, 943 F.3d at 1101. Mr. Porraz ran the Chicago chapter of the Kings and personally shot at rival gang members on 5 separate occasions. He also gave SOS orders, which were clear directions to kill. *Id.* at 1104 & n.1. Moreover, Mr. Porraz had a substantial criminal history prior to his arrest in this case, and as Inca "controlled the chapter's drug-trafficking activities, ensured that the chapter was well stocked with guns, and required members to participate in hood days." *Id.* at 1101. He received a 188 month sentence (15 years and 8 months). *See id*.

- Mr. Denava spent 10 years with the Latin Kings and served as both Enforcer and Inca. *See* Dkt. 1753 (Gov't Sentencing Memo) at 1. According to the government, "[f]or nearly a decade, he acted with total disregard for the value of human life, and for the law." *Id.* at 19; *see id.* at 5 (Denava's conduct evinced a "depraved indifference to human life"). According to the government, Mr. Denava is personally responsible for "*numerous* murders and other violent acts that he ordered or himself committed or attempted." *Id.* at 1 (emphasis added). Moreover, Mr. Denava orchestrated the savage beating of a member of the rival Spanish Vice-Lords, leaving him permanently brain damaged. *Id.* at 6-10. In addition to the "many heinous and depraved acts" for which he was being sentenced in this case, Mr. Denava had an extensive criminal history prior to this Indictment, and he was placed in Criminal History Category III. *Id.* at 17. Mr. Denava received a sentence of 200 months' imprisonment (16 years, 8 months). *See* Dkt. 2365 at 2.

- Mr. Luczak was found guilty to Count I after a trial. As the government described, he was sentenced for "two decades of violent gang activity" including "among the most serious crimes prosecuted in federal court." Dkt. 1781 (Gov't Sentencing Memo) at 14. He was a Latin King for over 20 years and served both as Inca and Cacique. *Id.* at 2. Before this case, Mr. Luczak already had 16 criminal convictions. *Id.* at 18. And one of the predicate acts he was indicted for in this case was the intentional, first-degree murder of Juan Serratos. *See* Dkt. 593 ¶¶ 9(w)(ii) and 11.[6] Moreover, his part of the Latin Kings racketeering enterprise included *personally* carrying out numerous attacks, including attempted murder, an attempted bombing (he threw dynamite at a rival's home), burning a rival's car, drug robberies, several beatings, and well as killing Mr. Serratos and bragging that "I'm the one that got [Mr. Serratos]." *See* Dkt. 1781 at 4-10. Mr. Luczak received 210 months' imprisonment (17 years, 6 months) despite his extensive, 20-year criminal history, his leadership roles in the Latin Kings, and the substantial evidence elicited at a trial of his direct involvement in numerous crimes, including murder.

---

6     The jury did not agree with the special finding requested by the government with respect to the Serratos murder, but the government advised the Court that it did not matter for purposes of sentencing, given the overwhelming evidence that Mr. Luczak killed Mr. Serratos. *See* Dkt. 1781 (Gov't Sentencing Memo) at 6-7.

15

- Mr. Trevino was indicted both for participating in the Latin Kings' RICO enterprise and for personally murdering someone as part of his gang responsibilities—in a killing the grand jury found to have been premeditated. *See* Dkt. 593 ¶¶ 9(w)(v), 11. In his Plea Declaration, he admitted to being the "Enforcer for the 97th Street Chapter of the Southeast Region. Dkt. 1331 (Trevino Plea Declaration) at 3. In this leadership role, Mr. Trevino personally beat another gang member, including stomping on his head, merely for disrespecting the Latin Kings. *Id.* at 5. And he admitting to shooting at members of the rival Aztec Soul gang after they made hand signs symbolizing disrespect for the Latin Kings, in an event that lead to one Aztec Soul being "shot in the stomach and sustain[ning] life-threatening injuries." *Id.* at 5-6. As the government summarized, Mr. Trevino "personally took part in gruesome violence in furtherance of the Latin Kings racketeering conspiracy—the fatal shooting of Ismael Perez in the chest; the shooting of R.V. in the stomach, causing nine holes to his body with one bullet and sending him to a hospital for two months; and the beating and stomping of J.A., shattering his cheek bone, merely because J.A. had slighted another Latin King. Trevino also took part in other shootings, the intimidation of a witness to the Perez murder, and extortion against gang members under his command as his chapter's Enforcer of the Latin Kings' constitution and manifesto and his chapter's hood laws." Dkt. 2195 (Gov't Sentencing Memo) at 1. Yet the government only recommended a sentence of 240 months for Mr. Trevino, *see id.* at 21, and the Court sentenced him to 210 months (17 years and 6 months)—*far* less than what is being requested for Mr. Ford.

Again, without minimizing the seriousness of Mr. Ford's conduct, when considering all the facts, he does not deserve a sentence materially longer than the sentences that Messrs. Denava, Luczak, or Trevino received. Each of Messrs. Denava, Luczak, and Trevino had extensive criminal histories prior to this RICO indictment. Denava, Luczak, and Trevino were grown men (not teenagers) when they participated in vicious crimes, repeated over many years. Each of them were more involved in the Latin Kings, over a longer time period than Mr. Ford. Indeed, each of Messrs. Denava, Luczak, and Trevino were *leaders* of the Latin Kings enterprise—and are at least as culpable as the soldiers they directed for the violent acts committed. And all three of these men participated in murders. Moreover, unlike Mr. Ford, <u>none</u> of them acknowledged the full extent of their guilt or truly expressed remorse, and indeed one of the three denied his guilt through a full trial on the merits. Respectfully, if even half of what the government said about these three men in its Sentencing Memoranda is true, Mr. Ford should receive a shorter prison sentence than any of them.

By contrast, the government will likely compare Mr. Ford to Alonzo Horta, another co-defendant. Mr. Horta was a soldier in the Latin Kings who pled guilty and received a 27-year sentence. But his criminal history and offense conduct is also worse than Mr. Ford's.

Mr. Horta was in Criminal History Category II at the time of sentencing due to prior convictions for battery and drug possession. *See* Dkt. 2266 (Gov't Sentencing Mem.) at 17. And separate from this criminal history, "Horta's record otherwise consists of one aggravation after another across his at least five years in the Latin Kings." *Id.* at 18. Horta severely beat one rival gang member, shot at another, and committed armed robbery. *Id.* at 4-10. Most seriously, on April 9, 2018, Mr. Horta brought a gun with him to a party in the Spanish Vice Lords' territory, with the intent to kill. Mr. Horta pulled out his gun, chased Alfonso Calderon, and shot him five times while he was running away. *See* Dkt. 2029 (Horta Plea Agreement) p. 8-9. Mr. Horta's murder of Mr. Calderon was indicted as a premeditated murder, *see* Dkt. 593 ¶¶ 9(w)(vi) and 11, committed while he was a legal adult, whereas Mr. Ford's killing of Mr. Hernandez was not premeditated, *id.* ¶¶ 9(w)(iv) and 11, and occurred while Mr. Ford was a minor. Separately, and in addition to these horrific, violent crimes, Mr. Horta "personally distributed cocaine" and, upon his arrest, officers recovered 8 bags of cocaine and 20+ rounds of live ammunition from his bedroom. Dkt. 2029, p. 10. More generally, Mr. Horta's life was characterized by "hatred, contempt, and remorselessness," which his social media posts describe in detail. *See* Dkt. 2266 (Gov't Sentencing Memo) at 18. Respectfully, Mr. Ford deserves materially less time in prison then Mr. Horta received, and a sentence closer to that given to Messrs. Denava, Luczak, and Trevino would be sufficient, but not greater than necessary, to meet the Section 3553 factors.

## II. SUPERVISED RELEASE

The Pre-Trial Services Officer recommends three years of supervised release following Mr. Ford's term in custody. Mr. Ford has no objection to a three-year term of supervised release and does not object to the proposed conditions of supervised release recommended in the PSR.[7]

## III. FINE

The Pre-Trial Services Officer does not recommend a fine. As the PSR states, Mr. Ford does not have the funds to pay a fine. (PSR ¶ 134.) Mr. Ford respectfully requests that the Court not impose a fine.

Date: July 6, 2021

Respectfully submitted,

KIRKLAND & ELLIS, LLP

/s/ Michael Slade
Brian D. Sieve, P.C. (6199741)
Michael B. Slade (6274231)
Ernst Pierre-Louis (6336563)
300 North LaSalle
Chicago, Illinois 60654
Phone: (312) 862-2000
Fax: (312) 862-2200
E-Mail: bsieve@kirkland.com
mslade@kirkland.com
ernst.pierrelouis@kirkland.com

*Counsel for Defendant Geronia Ford*

---

[7] Mr. Ford does note that the recommended supervised release conditions include up to 104 drug tests per year. *See* PSR, p. 24 (Mandatory Condition 6) and 25 (Discretionary Condition 9). While Mr. Ford has no objections to drug testing, he has some concerns that travelling to be drug tested twice a week for a three year period could interfere with seeking employment and (once he finds a job) successfully remaining gainfully employed. Mr. Ford assumes that the actual program of substance abuse testing implemented by his probation officer will be sufficient to ensure that he remains clean post-release without being so burdensome that it interferes with his ability to obtain a job and meet the requirements of that job.

# CERTIFICATE OF SERVICE

On July 6, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

*/s/ Michael Slade*
Michael B. Slade
*Counsel for Defendant Geronia Ford*
